Airchox Company, a corporation v. Commissioner.
Airchox Co. v. Commissioner
Docket No. 32020.
United States Tax Court
1953 Tax Ct. Memo LEXIS 22; 12 T.C.M. (CCH) 1414; T.C.M. (RIA) 53406; December 15, 1953
Edward T. Heineman, Esq., for the petitioner. Thomas C. Cravens, Jr., Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency of $16,185.31 in petitioner's excess profits taxes for the taxable year ended September 30, 1943. One issue has been waived by petitioner. The remaining question is whether petitioner is entitled to deduct certain alleged license costs in the fiscal years ended September 30, 1943 and 1945 [1] as ordinary and necessary expense under section 23 (a) of the Internal Revenue Code. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner *23 is an Illinois corporation and maintains its principal office in Chicago, Illinois. It kept its records on an accrual basis and filed its excess profits tax returns for the periods in controversy with the collector for the first district of Illinois. During the periods in controversy, petitioner was engaged in the manufacture and sale of aeronautical devices. During the years 1942, 1943 and 1944, Edward A. Joyce was its president and in charge of its operations. During the periods in controversy Evelyn C. Joyce, wife of Edward A. Joyce, owned 94 per cent of the outstanding common stock and 90 per cent of the preferred stock of petitioner. This stock had been placed in her name when petitioner was organized in 1941. No other classes of stock in petitioner were authorized or outstanding during the periods in controversy. On December 15, 1942, Edward A. Joyce entered into an agreement with Frank G. Manson and James G. Maskey covering inventions on certain aeronautical devices. This agreement gave Joyce an exclusive right to manufacture and sell these devices in the United States and to obtain similar exclusive rights in other countries. It also gave Joyce the right to grant sublicenses *24 of the inventions, but any complete divestment of interest required the approval of the licensors. Joyce agreed to pay a royalty fee of five per cent of the net selling price of all devices made under the agreement by Joyce or his assignees or sublicensees, for the life of the last-expiring patent covering the inventions, with certain exceptions. Joyce was required to pay a total of $45,000 at the rate of $15,000 per annum between the date of the agreement and July 1, 1945, which was to be credited as advance payments against any obligation to pay royalties which might arise under the terms of the agreement. Failure to make these advance payments in accordance with the agreement would automatically result in its termination. On January 5, 1943, petitioner's Board of Directors held a special meeting. The minutes of this meeting stated that Joyce advised the Board of his acquisition of the commercial rights to the Manson and Maskey patents and offered to grant petitioner a nonexclusive sublicense therein in exchange for a minimum royalty of 7 1/2 per cent of any net sales, a "license fee" of $5,000 per year, and an undertaking by petitioner to assume the liability incurred by Joyce *25 to his licensors in the amount of $45,000 by reimbursing him in that amount over a three-year period. The following resolution was unanimously adopted by petitioner's directors: * * *
"THEREFORE, BE IT RESOLVED, that AIRCHOX COMPANY enter into a license agreement with Edward A. Joyce covering the inventions herein above referred to, and proceed to manufacture and sell and/or otherwise dispose of the items covered in such an agreement, and the proper officers of AIRCHOX COMPANY are hereby authorized and directed to execute a license agreement with said Edward A. Joyce, and upon consummation thereof, file the same in the document files of the Company, and to pay over to said Edward A. Joyce, as the same shall become due over the period of three years from December 15, 1942, the sum of Forty-five Thousand ($45,000.00) Dollars." Pursuant to the direction and authorization contained in the minutes of the meeting of the Board of Directors of petitioner on January 5, 1943, an agreement was executed on January 5, 1943, between Edward A. Joyce and petitioner. Under the terms of this agreement petitioner acquired a nonexclusive right to manufacture and sell the patented devices coextensive *26 in duration and geographic scope with the terms of Joyce's license. Joyce was to receive a royalty of 7 1/2 per cent of the net selling price of any devices sold by petitioner pursuant to its sublicense, with certain exceptions. Joyce was also guaranteed a minimum royalty of $5,000 per year, regardless of petitioner's production. On March 3, 1943 petitioner's Board of Directors held a special meeting. The minutes of this meeting referred to the amount of $45,000 "* * * payable to Mr. Joyce over a three-year period from December 15, 1942, as reimbursement to him for monies advanced and to be advanced to Messrs. Frank G. Manson and J. J. Maskey * * *." During the period between September 30, 1942, and September 30, 1945, Edward A. Joyce voluntarily requested that his salary from petitioner be cut. His reason for this was that his commissions from petitioner ran over $100,000 per year, and he was having to pay income tax of sixty or seventy thousand dollars. The requested salary cut was granted by petitioner. On February 9, 1944, Edward A. Joyce also waived his right to the $5,000 minimum royalty or license fee which he was entitled to receive under his agreement with petitioner *27 dated January 5, 1943. This waiver was accepted by petitioner. Edward A. Joyce did not report income from any license agreements with petitioner in his Federal income tax returns for any of the calendar years 1943, 1944, 1945 or 1946. Petitioner at no time during the periods in controversy manufactured or sold commercially any of the articles covered by the license agreement dated January 5, 1943, between Edward A. Joyce and petitioner, and none of the percentage royalties provided therein ever became payable by petitioner. The licensing costs of $15,000 incurred by petitioner in each of the years in controversy were ordinary and necessary expenses of its business. Opinion Petitioner was licensed by the husband of its principal stockholder, Joyce, to manufacture and sell articles covered by patents of which he was the assignee or exclusive licensee. Under the contract by which he obtained his patent rights he was required to pay his assignors the sum of $15,000 a year for three years. These amounts were actually paid by petitioner. It is their deductibility which constitutes the issue. Our ultimate finding disposes of the question which is "of course, purely factual." Ingle Coal Corporation, 10 T.C. 1199, 1204, *28 affd. (C.A. 7) 174 Fed. (2d) 569. While it is true that the relationship of the parties requires a scrutiny of the transaction in issue and that because a payment is made pursuant to an agreement it may not follow that the amount is automatically deductible, Welch v. Helvering, 290 U.S. 111; Interstate Transit Lines v. Commissioner, 319 U.S. 590; Granberg Equipment, Inc., 11 T.C. 704, the present situation does not appear to us one where the application of these principles will defeat the deduction. Joyce apparently made his contract for the acquisition of the patents in an arm's length transaction. Petitioner paid no more than Joyce was required to pay under that contract. We regard this as adequate evidence that the amount of the payments was not unreasonable or in excess of the fair market value of the rights transferred. No evidence to the contrary was offered by respondent. Petitioner having been placed in a position to benefit by the use of the patents, there is no reason to assume that the payments would not be ordinary and necessary business expenses if they were not unreasonably large. Thomas Flexible Coupling Co., 14 T.C. 802, *29 affd. (C.A. 3) 198 Fed. (2d) 350; Heatbath Corp., 14 T.C. 332. And although the contract between Joyce and petitioner did not itself include the requirement that the payments due his assignors be assumed, the license which he granted was, according to the minutes of the directors' meeting, conditioned upon petitioner's agreement to undertake that obligation. This was confirmed by petitioner's subsequent action. We think it follows that in exchange for an asset acquired by it, petitioner made payments which were deductible as ordinary and necessary business expenses and that the close relationship of Joyce to petitioner's controlling stockholder does not under the existing circumstances indicate that the amount in question was either unreasonably large nor an extraordinary or unnecessary expense. Decision will be entered under Rule 50. Footnotes
1. The fiscal year ended September 30, 1945 is involved because of a carry-back claim.↩